[L. A. No. 20746. In Bank. Feb. 14, 1951.]

MORRIS ORLOFF, Appellant, v. LOS ANGELES TURF
CLUB, INC., et al., Respondents.

William Katz for Appellant.

Victor Ford Collins and Arnold M. Cannan for Respondents.

Freston & Files, as Amici Curiae on behalf of Respondents.

SHENK, J.—The plaintiff sought an injunction to restrain the defendant from refusing to admit him to the racing arena of Santa Anita Park. The complaint shows that on the 31st day of January, 1946, the plaintiff purchased a ticket and was admitted to the park at 1 p. m. At 4 p. m. he was ejected. His ejection under similar circumstances occurred on February 2, 1946. Both occurrences were alleged to have been without cause or provocation on the plaintiff's part. The plaintiff has been refused admittance to the park since his removal therefrom.

The case was before this court previously on an appeal wherein a judgment of dismissal, entered on an order sustaining the defendant's demurrer, was reversed. (30 Cal.2d 110 [180 P.2d 321, 171 A.L.R. 913].) Upon the reversal a trial was had, at the close of which the court made findings favorable to the defendant and entered judgment denying injunctive relief. The present appeal is from that judgment.

The issues involve the construction and application of sections 51-54 of the Civil Code. Section 51 provides that all citizens under state jurisdiction are entitled to the full accommodations, advantages, facilities and privileges of hotels, eating places, barbershops, theaters, conveyances, and other

places of public accommodation and amusement subject only to the conditions and limitations established by law applicable alike to all citizens.

Section 53 provides that it is unlawful for the proprietor of any "opera-house, theater, melodeon, museum, circus, caravan, race-course, fair or other place of public amusement or entertainment, to refuse admittance to any person over the age of twenty-one years, who presents a ticket of admission acquired by purchase, or who tenders the price thereof for such ticket, and who demands admission to such place. Any person under the influence of liquor, or who is guilty of boisterous conduct, or any person of lewd or immoral character, may be excluded from any such place of amusement." Sections 52 and 54 prescribe the liability of persons who deny such accommodations and privileges.

In substance the following evidence is relied on by the defendant to support the judgment. Between 1929 and 1939 the plaintiff was convicted in seven cases of various misdemeanors. Four of the convictions, form chart possession, were under an ordinance held to be invalid in *In re Page* (1931), 19 Cal.App.2d 1 [298 P. 178]. In 1929 he paid a $10 fine on a conviction of gambling. In 1935 he was convicted of bookmaking (Pen. Code, § 337a) on a plea of guilty and received a suspended 30-day sentence and paid a $100 fine. In July, 1939, he pleaded guilty to a charge of violation of section 3 of Act 3421, Deering's General Laws (Regulation and Licensing of Horse Racing) by the placing of a wager outside of the course, and paid a $50 fine. There is no evidence that any of the violations was committed on a racecourse. There was no evidence that the plaintiff was drunk, boisterous, lewd or conducted himself in any but an orderly and proper manner. The track's arresting officer testified that he observed the plaintiff talking to persons who, by check with police files, were stated to have criminal records. The plaintiff conducts one or more restaurants. The testimony of two police officers was that they "investigated" the plaintiff's reputation, and that their investigation disclosed that he was reputed to be a bookmaker and doing a bookmaking business; that at the "present time" he was not known as a bookmaker but as a gambler, and that his place of business was known as a congregating place for professional gamblers and bookmakers.

The trial court did not find that the plaintiff was a person of immoral character. The finding is that he had a reputation as a man of immoral character, was a known un-

desirable, and a person guilty of conduct detrimental to racing and to the public welfare. This finding purported to justify the defendant's exclusion of the plaintiff from the racecourse pursuant to rules formulated by the horse racing board regulating the application for and granting of licenses, the conduct of races, and other matters pertaining to the operation of racecourses where wagering is permitted. (Cal. Adm. Code, title 4, § 1400 et seq.; § 19561 Bus. & Prof. Code.) The defendant relies on the following rules:

Rule 319 (§ 1936), which provides that persons guilty of dishonest or corrupt practices, fraudulent acts or other conduct detrimental to racing shall be ruled off all racing enclosures, and stewards are required to exclude them; rule 320 (§ 1937), which extends the exclusion to all recognized courses in the state; rule 354 (§ 2009), which provides that an association shall not permit the making of handbooks on its grounds and if such practice is found to exist, the association shall take immediate steps to eliminate it under penalty of revocation of its license; and rule 355 (§ 2010), which requires the association properly to police the grounds and to eject therefrom known undesirables, touts, persons under suspension or ruled off, persons of lewd or immoral character, and persons guilty of boisterous or disorderly conduct or other conduct detrimental to racing or the public welfare.

There is here no quarrel with these rules insofar as they relate to the regulation of the licensee and its employees in the conduct of the races and of wagering on the results thereof. However, insofar as they govern the licensee in exercising the power of exclusion of persons from participation in the public entertainment afforded, they may not be deemed to narrow the established right of participation by all persons on an equal basis. The rule-making power of the board was upheld in *Sandstrom* v. *Cal. Horse Racing Board,* 31 Cal.2d 401 [189 P.2d 17]; but in exercising that power the board may not enlarge the instances when the proprietor of a public racecourse may lawfully place restraints on the rights of members of the public to attend the races and participate in the wagering on the results thereof. Rules for proper policing of the course are required in the public interest; but the exercise of the power may not be made an occasion to extend discriminatory exclusion beyond that reasonably provided by the Legislature in the exercise of the police power.

The board may make only such exceptions in the public's right of equal participation as are validly included in the Civil Code. (*Boone* v. *Kingsbury*, 206 Cal. 148, 161 et seq. [273 P. 797]; *California Drive-In Restaurant Assn.* v. *Clark*, 22 Cal.2d 287, 302-303 [140 P.2d 657, 147 A.L.R. 1028]; *Whitcomb Hotel, Inc.* v. *California Emp. Com.*, 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405] and additional cases cited.)

We may assume that the defendant would have been justified in ejecting and refusing admittance to the plaintiff had there been evidence of his making book on the racecourse. It would not be questioned that such violation of law would constitute conduct justifying the action and would be within the compass of the power to police the premises under the code and the rules. But there is no such evidence here, and its absence has compelled the defendant to rely on the asserted sufficiency of the evidence to support a conclusion that the plaintiff was a person of immoral character justifying the action in excluding him from the course.

There is thus brought into focus the question of what immorality will warrant the action taken. In this connection the plaintiff contends that section 53 of the Civil Code is unconstitutional in providing for exclusion on the basis of "immoral character" because that phrase provides no definite standard; that the term "immoral character" is too vague and uncertain to apply as a standard or guide; that in any event the evidence of specific acts committed outside the course more than six years previously and the purported evidence of reputation are too remote as proof of immoral character.

It is unnecessary here to determine when evidence of specific acts or when evidence of reputation may be received as tending to prove character. (See Wigmore on Evidence, 3d ed., vol. 1, p. 689 et seq.; see also *Cosgrove* v. *Pitman*, 103 Cal. 268, 275 [37 P. 232]; *People* v. *Ridgeway*, 89 Cal.App. 615, 618 [265 P. 349].) The trial court admitted both types of evidence, namely that of past convictions of offenses pertaining to gambling and bookmaking, and purported evidence of the plaintiff's reputation. For reasons hereinafter appearing we conclude that the evidence of conduct was not relevant to any proper ground for the defendant's refusal to admit him to the arena. For similar reasons the evidence of the plaintiff's reputation had no relation to a proper ground for his exclusion from the course. Furthermore, the evidence

received as bearing on the question of reputation was incompetent as hearsay and the court should have sustained the plaintiff's objection on that ground. The testimony was not given by persons who knew the defendant's reputation, but by witnesses who inquired of others as to the defendant's reputation. The rule is that evidence of reputation when relevant may not be shown by witnesses conducting an inquiry, but must be given by persons having knowledge thereof. (*Tingley* v. *Times-Mirror Co.,* 151 Cal. 1, 26-27 [89 P. 1097] and cases cited.)

 The so-called civil rights statutes (Civ. Code, §§ 51-54) do not necessarily grant theretofore nonexistent rights or freedoms. The enactments are declaratory of existing equal rights and provide the means for their preservation by placing restrictions upon the power of proprietors to deny the exercise of the right and by providing penalties for violation. In *Greenberg* v. *Western Turf Assn.,* 140 Cal. 357, 361 [73 P. 1050], 148 Cal. 126, 128. [82 P. 684, 113 Am.St.Rep. 216], (affirmed 204 U.S. 359 [27 S.Ct. 384, 51 L.Ed. 520]), this court spoke of the predecessor of the present statute (Stats. 1893, p. 220) as a regulation of places of amusement in the exercise of the police power. In affirming the determination as to the validity of the statute, the United States Supreme Court (204 U.S. at p. 364) stated that the racecourse, being a place of public entertainment, was so far affected with a public interest that the state might, in the interest of good order and fair dealing, require the proprietor to recognize its own tickets of admission.

Under our institutions the freedom to pursue the declared right on an equal basis is just as precious as many other freedoms and rights. The exercise of the power of its denial, being a restraint on a personal right, is circumscribed by the same constitutional safeguards of equal protection and due process as are restraints under penal laws. The requirement that a law be definite and its meaning ascertainable by those whose rights and duties are affected applies not only to penal statutes but to all laws governing fundamental rights and duties. (*In re Stewart,* 24 Cal.2d 344 [149 P.2d 689], applied to a judgment; *In re Leach,* 215 Cal. 536, 544 [12 P.2d 3], applied to a statute governing the sale of securities; *In re Peppers,* 189 Cal. 682 [209 P. 896], applied to a statute governing shipments of oranges. A statute not sufficiently certain is repugnant to the due process clause. (*Lanzetta*

*v. New Jersey,* 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888].) The plaintiff is thus a person entitled to know by reasonably definite standards when the right here involved may lawfully be withheld.

The term "immoral" has been defined generally as that which is hostile to the welfare of the general public and contrary to good morals. Immorality has not been confined to sexual matters, but includes conduct inconsistent with rectitude, or indicative of corruption, indecency, depravity, dissoluteness; or as wilful, flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare. (Words & Phrases, Perm. ed. vol. 20, pp. 159-160.)

The Legislature did not specify who was to be considered a person of immoral character. Failure of greater specification where restraints on the exercise of fundamental rights are involved, as indicated, may be fatal to the application of the statutory standard or guide. But the omission in the present statute is not fatal to any use of the standard of immorality as a guide. ▌ Here it becomes a matter of construction and application conformable to the legislative objective in providing the various standards. In pursuing the investigation into the legislative objective (Civ. Code, § 4) it is observed that there is no procedure provided for an inquiry into good moral character as a preliminary to the exercise of the declared right. A preliminary inquiry into the general moral character of an applicant for admittance to a public place of amusement, even if feasible, could not have been intended. Cases involving the method of ascertaining the good moral character required of an applicant for a privilege, such as the license to operate the racecourse, are inapplicable.

In providing the standards to guide proprietors in placing restraints on the exercise of the personal right here involved the Legislature was undoubtedly concerned with the safety and welfare of the attending public. The general objective was the protection of others on the premises. As in other matters involving the exercise of the police power, reasonableness is the governing criterion. The statute justifies the denial of the declared right to persons under the influence of liquor and to persons engaging in boisterous conduct. Such conditions ordinarily are obvious. In these respects the standards do not suggest an inquiry beyond visible or readily

ascertainable aspects and exclusion on those grounds is reasonable. ▌ Similarly reasonable as a ground of exclusion is the commission when applying for or after admittance, of lewd, immoral, or other acts inimical to the public safety or welfare. A determination concerning the then commission of such acts is likewise made from visible and obvious factors. But the private business, the personal relations with others, the past conduct not on the premises, of a person applying for or admitted to the course, whether or not relevant to indicate his character, are immaterial in the application of the statutory standards under the facts of this case.

It may be assumed that the plaintiff might be suspected of illegal gambling activities off the racecourse. The defendant would be justified in taking reasonable precautions to prevent opportunities for the commission of criminal activities on the course. ▌ Here, however, there is no evidence whatsoever, and it is not suggested, that the plaintiff while on the course was or ever had engaged in illegal activities or in an attempt to commit a crime. Under any proper construction and application of the statutory guides, mere suspicion based on past conduct and alleged reputed activities off the course, or on conversations without disclosure of their substance held on the course with persons considered questionable, did not justify the ejection or exclusion of the plaintiff.

Therefore, contrary to the suggestion of amici curiae as to a proper ground for denying injunctive relief, it was not the legislative intent to vest authority in the proprietor to determine primarily and in every instance what persons or classes of persons should be deemed sufficiently moral to be admitted to the course and thus be permitted to engage in lawful gambling. It could not have been intended that the proprietor should be confronted with the impossible task of determining who among its patrons were sufficiently moral to be permitted to attend and there to engage in lawful on-track gambling and who were sufficiently immoral because of suspected unlawful off-track gambling to justify exclusion from the course. As indicated it is a person's conduct when entering and attending a public place covered by the sections to which the statutory standards apply. It was neither necessary nor reasonable to go further in order to attain the legislative objective in furnishing the prescribed guides, and it must be concluded that such was the intended extent of

their application. A contrary conclusion would be a denial of equal protection and due process. (See also *State* v. *Truby*, 211 La. 178 [29 So.2d 758]; *State* v. *Vallery*, 212 La. 1095 [34 So.2d 329].)

The foregoing is not intended to foreclose inquiry into the question whether a person justifiably ejected from a race-course may thereafter be excluded from the same and other courses. Exceptional cases are to be determined on their own facts. On the present record the evidence does not support the findings or the judgment.

The judgment is reversed.

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

SPENCE, J.—I concur in the reversal of the judgment, as I am of the view that under a proper construction of the statute before us, the evidence was insufficient to justify the exclusion of plaintiff from the racetrack. I also agree with the conclusion of the majority opinion that the rights of the parties must be determined under the statute rather than under the rules, as the board had no power by rule to provide for the exclusion of members of the public upon grounds other than those provided in the statute. I cannot, however, subscribe to the construction placed upon the statute in the majority opinion, for, in my opinion, such construction alters the meaning of the statute and defeats the legislative intent and purpose.

A reading of section 53 of the Civil Code shows that it is applicable not only to a "race-course" but also to any "theater, melodeon, museum, circus, . . . fair or other place of public amusement or entertainment." By its terms, it permits the proprietor to exclude from any such place only certain persons, including a "person of lewd or immoral character." The intent and purpose of such permissible exclusion seems clear. As stated in the majority opinion, "the Legislature was undoubtedly concerned with the safety and welfare of the attending public," and the "general objective was the protection of others on the premises." It is a matter of common knowledge that many of such places of public amusement and entertainment are heavily patronized by young men and women, as well as by small children, and that the records of our courts abound with the criminal prosecutions of sex offenders, in which it appears that their initial advances upon their

victims were made in such places. These considerations were unquestionably in the minds of the legislators when enacting said section 53, and it seems obvious that it was the intent and purpose of the Legislature, in including the phrase in question, to permit the proprietor of any such place to exclude from admission known sex offenders, including sexual perverts, to the end that other patrons would not be molested by the advances of such undesirables.

As I read the majority opinion, it would deny to the proprietor of such an establishment permission to exclude any known sex offender unless and until such person might be actually caught in the commission of a lewd or immoral act on the premises. So it is said that "past conduct not on the premises . . . whether or not relevant to indicate his character" is "immaterial," and it is indicated that the only material consideration is "the person's conduct when entering and attending" the place of public amusement or entertainment. Thus, the effect of the majority opinion is to rewrite the phrase permitting the exclusion of a "person of lewd or immoral character" to permit the exclusion only of a "person guilty of lewd or immoral conduct at the place of public amusement or entertainment." This constitutes a complete emasculation, rather than a construction, of the phrase under consideration. Furthermore, it renders the phrase practically meaningless and without purpose, as there are numerous statutes prohibiting lewd and immoral acts under which a person committing such acts at a place of public amusement might be arrested and summarily ejected from such place. It thus appears that the salutary purpose of the phrase under consideration is defeated by the construction placed upon it in the majority opinion.

The question remains as to whether such phrase can be otherwise construed so as to withstand the attack made upon it because of its claimed uncertainty. In my opinion, it can and, as hereinafter construed, no valid constitutional objection can be interposed.

It must be remembered that, contrary to the implications in the majority opinion, the source of plaintiff's right, or the right of any person, to be admitted to a place of public amusement rests solely in the statutes under consideration. No such right is accorded by the Constitution, and no such right existed at common law. (*Finnesey* v. *Seattle Baseball Club*, 122 Wash. 276 [210 P. 679, 30 A.L.R. 948]; annos. 30

A.L.R. 951, 60 A.L.R. 1089; also, *Greenberg* v. *Western Turf Assn.,* 140 Cal. 357 [73 P.⸲1050] ; 148 Cal. 126 [82 P. 684, 113 Am.St.Rep. 216].) The statement in the majority opinion that "The enactments are declaratory of existing equal rights . . ." is not supported by the citation of a single authority. On the contrary, the right of any person to admission to such places is measured entirely by the terms of such statutes, and it is the duty of this court to place a reasonable and workable construction upon the statutory limitations affecting such right, if such construction is possible.

It may be freely conceded, as indicated in the majority opinion, that the word "immoral," when standing alone, has "no fixed and well defined meaning," and that it "might mean anything and might have different meanings in the minds of different people" (*State* v. *Truby* (1947), 211 La. 178 [29 So.2d 758, 760]) so that its use alone would create no "certain or understandable rule" (*State* v. *Vallery* (1948), 212 La. 1095 [34 So.2d 329, 331]). But if, as assumed in the majority opinion, the word "immoral" is objectionable here because of its uncertainty, it is equally objectionable as a description of conduct as it is as a description of character. In passing, it appears appropriate to suggest that there are numerous persons whose concepts of morality are such that, according to their standards, any person who makes a practice of attending racecourses for the purpose of engaging in pari-mutuel betting, and, *a fortiori,* any person who makes a business of conducting for profit such pari-mutuel betting or any other gambling enterprise, is a person of "immoral character." It seems certain that those engaged in the conduct of race-courses would be the last to suggest that the Legislature intended to adopt, or that any court or jury should apply, such a high standard; and yet the question remains as to where the line can be drawn in the determination of who is and who is not a "person of lewd or immoral character" within the meaning of the statute, unless it be drawn as herein indicated.

The vice of the majority opinion lies in its consideration of the word "immoral" alone and out of context. Here the statute authorizes the exclusion of a "person of lewd or immoral character." The descriptive qualification appears as an integrated limitation, with the association of wording indicative of the Legislature's intent that the word "immoral" partake of the same connotation in meaning as the word

"lewd," one in juxtaposition with the other in completing the phrase. The word "lewd" has been defined by lexicographers to mean "given to the unlawful indulgence of lust; eager for sexual indulgence" (*United States* v. *Bebout,* 28 F. 522, 524; *Jamison* v. *State,* 117 Tenn. 58 [94 S.W. 675, 678]); "lascivious, lecherous; tending to excite lustful thoughts" (*Ledbetter* v. *State,* 184 Tenn. 396 [199 S.W.2d 112, 114]). Accordingly, the term "immoral character" as used in the same phrase would signify its meaning as focused upon character with respect to sex infractions. The fact that the connection between the related words is in the disjunctive rather than in the conjunctive does not militate against their interpretation by reason of association, when necessary to effectuate the legislative intent. (23 Cal.Jur. § 115, p. 737; *In re Sekuguchi,* 123 Cal.App. 537, 538 [11 P.2d 655].) Under the rule of *noscitur a sociis* the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be construed so as to harmonize with the context as a whole. (50 Am.Jur. § 247, p. 241; 23 Cal. Jur. § 129, p. 755; *United States* v. *Lewis,* 110 F.2d 460, 462; *Vilardo* v. *County of Sacramento,* 54 Cal.App.2d 413, 420 [129 P.2d 165].) So pertinent is the observation of Mr. Justice Holmes when he said, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." (*Towne* v. *Eisner,* 245 U.S. 418, 425 [38 S.Ct. 158, 62 L.Ed. 372, L.R.A. 1918D 254].)

As so restricted in meaning to its relation to sex infractions, the term "immoral character" furnishes a sufficiently definite description setting up authorized standards for the exclusion of persons from places of public amusement. In the interpretation of statutes, a construction that "leads to uncertainty or confusion" and would be "productive of . . . insecurity" will be avoided in favor of a construction that will "afford a fixed, permanent and certain rule to ascertain whether a particular case is included within or excluded from the operation of the statute." (50 Am.Jur. § 382, p. 394.) So here, by confining the concept of the word "immoral" to coordinate with the measure of sex considerations inherent in the word "lewd," the entire phrase, "a person of lewd or immoral character," is given a sufficient precision in meaning and rendered unobjectionable on the premise of being vague

and indefinite according to recognized standards of conduct. (*United States* v. *Lewis, supra,* 110 F.2d 460, 462.)

I therefore agree that the judgment must be reversed because of the absence of any evidence whatever to show that plaintiff was "a person of lewd or immoral character" as that phrase has been here construed. I cannot join, however, in the declarations of the majority opinion which construe the statute so as to deny to the proprietor of a place of public amusement the right to exclude from his premises objectionable sex offenders, as to whom the phrase under consideration was clearly intended to apply.

Edmonds, J., concurred.

Respondents' petition for a rehearing was denied March 15, 1951. Edmonds, J., and Spence, J., voted for a rehearing.